1    **A.**    You did.

2    **Q.**    Were you or Ms. Mullins, in the Summer of 2022, meeting

3    on a regular basis with the WVOT IRM?

4    **A.**    Ms. Mullins was.

5    **Q.**    How often did Ms. Mullins meet?

6    **A.**    I think they have a monthly meeting scheduled.

7    **Q.**    In the Summer of 2022, when evidence preservation

8    letters started coming from my office, did you or Ms.

9    Mullins meet with the West Virginia Office of Technology to

10   discuss the technological needs of the State of West

11   Virginia relative to preserving evidence?

12   **A.**    No.

13   **Q.**    Was there an impediment or something that prevented you

14   or Ms. Mullins from meeting with your IRM and the West

15   Virginia Office of Technology in the Summer of 2022?

16   **A.**    No.

17   **Q.**    So, there's no reason, as you sit here today, that DHS

18   and DCR would have been prevented or couldn't have met with

19   the IRM and the Office of Technology to explain evidence

20   preservation needs; is that a fair statement?

21   **A.**    That is.

22   **Q.**    Go to 6.1.2.  One of the agency responsibilities under

23   this policy authorizing agency user system access computer

24   equipment or network accounts, correct?

25   **A.**    Correct.

1    **A.**   Correct.

2    **Q.**   Now, Mr. Douglas, as Chief of Staff, were you made

3    aware of evidence preservation letters being sent out by my

4    office in the months of June and July, 2022?

5    **A.**   Yes.

6    **Q.**   How were you made aware?

7    **A.**   I believe I was copied on an e-mail.

8    **Q.**   Let me know when you've reviewed that, sir.

9    **A.**   Okay.

10          MR. NEW:  And, Your Honor, for the record, this is

11   Exhibit 3.  It's an e-mail string.

12          THE COURT:  You've already pre-marked these,

13   right, with the court reporter?

14          MR. NEW:  Yes, Your Honor.

15          BY MR. NEW:

16   **Q.**   Sir, you see here that on Thursday, July the 7th, 2022

17   at 10:43 a.m., Michael Francis forwards a letter to Jackie

18   Binion, Marvin Plumley, Della Hall, Susan Harding and Harold

19   Withrow.  Do you see that?

20   **A.**   I do.

21   **Q.**   And Jackie Binion was some type of regional manager

22   over the Southern Regional Jail, correct?

23   **A.**   That's correct.

24   **Q.**   And Marvin Plumley was his superior within DCR?

25   **A.**   That's correct.

1    **Q.**   So, it's my fault the evidence wasn't preserved at the

2    Southern Regional Jail?

3    **A.**   With respect to the video issue, yes.

4    **Q.**   Did you ever invoice me, say bring hard drives out?

5    **A.**   We were represented by counsel, so that was the limit

6    of my involvement.

7    **Q.**   Fair to say that Mr. Murray isn't too technologically

8    savvy?

9    **A.**   I don't know for sure, but you're probably right.

10   **Q.**   Did you task Mr. Murray or Anspach with the purchase of

11   these four 18-terabyte hard drives and say get the money

12   back from New?

13   **A.**   No, because your associate, Russell Williams, said that

14   your office would buy them.

15   **Q.**   Okay.  Do you know how much they cost at Staples or

16   Amazon?

17   **A.**   No idea.

18   **Q.**   $259.  But that's just -- video is just one aspect of

19   this preservation of evidence, isn't it, Mr. Sword?

20   **A.**   Yes, sir.

21   **Q.**   Let's talk about e-mail accounts.  Did you play any

22   role in attempting to assist DHS and DCR with the

23   preservation of e-mail accounts that would be crucial to

24   this litigation?

25   **A.**   Outside of providing them with your letters, no.

Betsy Jividen - Direct (New)

1    department that would maintain case files and that would be

2    tracking litigation at that point.

3    **Q.**    Didn't call for any meetings?  You didn't say, Brad,

4    let's get the Office of Technology together since you're the

5    technology guy.  You're the document retention, the agency

6    management manager for my organization.  It looks like

7    there's a storm of litigation coming out of Beckley, West

8    Virginia with Quantez Burks' death, Secretary Wriston's

9    nephew's death, and now I've gotten 12 or 15 evidence

10   preservation letters together.  Nothing like that happened

11   in the Summer of 2022, did it?

12   **A.**    Other than making sure that Legal was aware, I did not

13   gather a team.

14   **Q.**    Did you follow up with Legal and say, hey, we've got a

15   storm of litigation coming out of the Southern Regional Jail

16   with the Burks death, the Wriston death, 13 deaths, and now

17   they're griping about the conditions of the overcrowding,

18   and maintenance, and water, and showers, and sinks.  Let's

19   -- let's get everybody together.  Did you follow up with

20   Legal about it?

21   **A.**    As far as document retention goes?

22   **Q.**    Yes, evidence preservation?

23   **A.**    No.  Not that I recall.

24   **Q.**    Do you -- what you're telling this Court, understanding

25   how crucial evidence preservation letter -- evidence

Michael Francis - Direct (New)

1   **Q.**   And why did you do that?

2   **A.**   Because that was the protocol.  The protocol was that

3   when you got something like that there was a group of

4   individuals that you sent that to.  So, I immediately send

5   those when they're -- when they're given to me from the

6   front office, I would scan them, e-mail them, send them up

7   the chain.

8         And then we had daily meetings.  I had daily meetings

9   with my staff and we would discuss things like that.  And I

10  do remember, because I was getting ready to go on vacation.

11  So, I was -- and that was basically the last I was going to

12  do in the facility.

13        And I went over and spoke with Hal Withrow because Hal

14  had taken over in Larry's office and basically Larry Warden

15  was the one that took care of all the logs, videos to make

16  sure that nothing happened to anything.  And I went over to

17  him and told him, I said, look, Buddy, I'm getting ready to

18  leave.  You don't get rid of anything.

19  **Q.**   Okay.

20  **A.**   And that was it.

21  **Q.**   You've heard some testimony here today about the

22  deprovisioning of e-mail accounts.  Do you know what that

23  means?

24  **A.**   I do now.  I -- you want my honest opinion?

25  **Q.**   Of course.

1        (No response)

2              THE COURT:  Thank you, ma'am.  You may step down.

3        Is this witness excused?  Is this witness excused?

4              MR. NEW:  Yes, Your Honor.

5              THE COURT:  You're free to leave.

6        Come on up for me, please.  Over here is a ramp.

7   There's the witness stand right there.  Just watch your

8   step.

9        If you would raise your right hand for me, ma'am.

10       **DANIELLE COX, PLAINTIFF WITNESS, SWORN WITNESS, SWORN**

11             THE COURT:  Thank you.

12       If you would have a seat there.  Say your name for the

13  record.  Pull that mic down toward you.  Say your name for

14  the record and spell it, please.

15             THE WITNESS:  Danielle Cox, D-a-n-i-e-l-l-e C-o-x.

16             THE COURT:  Thank you.

17       Mr. New?

18                         **DIRECT EXAMINATION**

19             **BY MR. NEW:**

20  **Q.**   Ms. Cox, how were you employed in the Summer of 2022?

21  **A.**   I worked for the Office of Technology as the Chief

22  Information Security Officer.

23  **Q.**   Sounds like an important title.  Can you tell the Court

24  what you do as the Chief Information Security Officer of the

25  West Virginia Office of Technology?

1    A.    I protect the systems and data for integrity,

2    availability and confidentiality.

3    Q.    If a state entity like DCR or DHS wanted to preserve

4    the e-mail accounts for employees who were leaving would you

5    work with that agency or those agencies to accomplish that?

6    A.    Yes, if that was my office.

7    Q.    Is that fairly easily done?

8    A.    Yes.  It could -- they have a couple of ways to do it.

9    Q.    Tell the Court how easily it's done that if an agency

10   like DHS or DCR wants the e-mail accounts for someone

11   preserved for, let's say, for something like this case, how

12   easily that gets done.

13   A.    That information would have to come up into whatever

14   Legal Department and then they would reach out to my office

15   via our standard form or potentially through a Customer

16   Relationship Manager or our service desk.

17   Q.    Does it cost the State of West Virginia anything to

18   preserve former employees' e-mail accounts?

19   A.    We do not currently bill for that, no.

20   Q.    June, July, August, 2022, did you or anyone in the West

21   Virginia Office of Technology receive a copy of evidence

22   preservation letters coming from my office regarding the

23   Southern Regional Jail?

24   A.    No.

25   Q.    In the Summer of 2022, and I mean June, July, August,

1   2022, did Phil Sword, anyone with Legal, Brad Douglas, or

2   anyone with DHS or DCR contact your office about the need to

3   secure and preserve evidence for the Southern Regional Jail?

4   **A.**   We don't have any record of that at that time, no.

5   **Q.**   Now, in terms of technological support that the Office

6   of Technology can offer to state agencies, I take it that,

7   if requested, you all can scan in bulk documents, if needed,

8   correct?

9   **A.**   We wouldn't -- our office wouldn't scan in documents,

10  no.  We would -- we produce documents from the systems we

11  maintain, but like physical paper, no.

12  **Q.**   Yes.

13  **A.**   Our office would not do that, no.

14  **Q.**   All right.  Your office maintains e-mail accounts,

15  correct?

16  **A.**   We're a service provider of e-mail, yes.

17  **Q.**   And your office maintains Google Drives, correct?

18  **A.**   Yes.

19  **Q.**   What type of information is on the Google Drives?

20  **A.**   Whatever the agencies put on there.  We're a service

21  provider.  We don't know what type of data or the

22  classification of their data.

23  **Q.**   Summer of 2022, or even after, did anyone ever request

24  the West Virginia Office of Technology to produce the Google

25  Drives for the Southern Regional Jail or any of the people

Case 2:24-cv-00507 Document 701 Filed 10/06/23/24 Page 154 9 of 84 PageID #: 571323

1   that have worked there?

2   **A.**   We had the request put in last month, in August, for

3   this case, yes.

4   **Q.**   You got a request for the first time to produce the

5   Google Drives for the Southern Regional Jail in August of

6   2023, correct?

7   **A.**   Yes.  Well, it's not for the jails.  It was for a list

8   of 30 users that were provided.

9   **Q.**   And that was the first time that your office had been

10  provided that?

11  **A.**   Yes.

12          MR. NEW:  I don't have anything further, Your

13  Honor.

14          THE COURT:  Go ahead.

15                    **CROSS EXAMINATION**

16          **BY MR. MULLINS:**

17  **Q.**   Just so we're clear here, the -- what you were provided

18  back in August, and that's an estimate, of 2023, was that an

19  ESI protocol that listed a whole bunch of different people's

20  names and then a whole bunch of terms that you were supposed

21  to search?

22  **A.**   I don't know what it was.  It was a two-page document.

23  We don't get the actual documents.  We have an internal

24  form.  I don't necessarily want our staff to have to

25  interpret legal documents.